# IN THE COURT OF APPEALS OF IOWA

No. 23-2060
Filed March 5, 2025

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**PAT GRANT KEPNER,**
    Defendant-Appellant.
_____

Appeal from the Iowa District Court for Boone County, Ashley Beisch, Judge.

A defendant appeals his convictions for indecent exposure. **AFFIRMED.**

Martha J. Lucey, State Appellate Defender, and Shellie L. Knipfer, Assistant Appellate Defender, for appellant.

Brenna Bird, Attorney General, and Genevieve Reinkoester, Assistant Attorney General, for appellee.

Considered by Schumacher, P.J., and Badding and Chicchelly, JJ.

**SCHUMACHER, Presiding Judge.**

Pat Kepner appeals his convictions for indecent exposure, arguing the district court committed error by excluding expert testimony on eyewitness identification. Upon our review, we affirm.

## I.      Background Facts and Proceedings

On March 30, 2022, K.W. drove to a Boone grocery store and parked her vehicle in a parking space with empty spaces on both sides. K.W. was having a phone conversation and did not get out of her vehicle right away. She noticed a car pulling into the spot next to her driver's side. The car was a "silver, four-door car, . . . early 2000s." A few minutes later, K.W. ended her phone call and exited her vehicle. K.W. saw a man in the driver's seat of the car next to her. She did not recognize the man. The man's shorts were pulled down around his knees, his genitals were exposed, and he was fondling himself. The two made brief eye contact. K.W. then walked around the back of the man's car and to the front of the grocery store, where she saw the man's vehicle drive away. K.W. reported the incident to the Boone Police Department.

On April 5, 2022, E.P. visited her gym in Boone. After her visit, she walked out to her large sports utility vehicle (SUV) in the gym parking lot, which was still parked as she had left it—with empty spaces on both sides. E.P. was looking at her phone as she settled into the driver's seat. She did not notice the car pulling into the spot next to her driver's side. While looking at her phone, E.P. noticed movement out of the corner of her left eye. She looked over and saw a man in the driver's seat of the car next to her. E.P. did not recognize the man. The man's genitals were exposed, and he was fondling himself. The man looked up at E.P.

and smiled.  But she could not see his eyes; the man was wearing sunglasses with reflective orange lenses.

Scared, E.P. stayed in her SUV and pretended to look at her phone as she considered what to do next.  The owner of the gym then pulled into the parking lot.  E.P. drove her vehicle to the owner and waved him over to her.  She described the incident to the owner and asked him to stay with her until the man drove away.  Shortly thereafter, as the man's vehicle exited the parking lot, E.P. and the owner each recorded what they perceived was the vehicle's license plate number.

E.P. reported the incident to the Boone Police Department right away.  E.P. described the car as a Toyota and a "silver, older sedan, four-door, with a sunroof . . . probably a [1990s]."  She and the gym owner both reported a license plate number to the police.  E.P. reported TAP265, which she recalled from watching the car in her rear-view mirror.  The owner, who had a direct view of the vehicle, reported TAG625.  But because the Iowa Department of Transportation had not yet begun issuing plates starting with "T," neither of the reported plate numbers were registered to any Iowa vehicle.  An officer then ran "some different combinations" and discovered license plate number IAP625 was issued to a silver Toyota registered in Boone County to Kepner.

Two days after the incident involving E.P., Detective Mayse from the Boone Police Department asked K.W. and E.P. to separately identify their offender using a photo array.  The array included Kepner's driver's license photo and the jail photos of five other men with physical appearances similar to Kepner's.  The backgrounds of all six photos were made to match.  A photo array of the same six photos were presented to both women.  K.W. was unable to identify anyone from

the array. E.P. identified Kepner's photo immediately, expressed difficulties after further review of all pictures, then confirmed her initial identification of Kepner.

After the photo identifications, Detective Mayse visited Kepner at his home for questioning. Bodycam footage from this visit captured video of Kepner. Detective Mayse used this footage when he again met with K.W. and E.P. separately for identification purposes. Detective Mayse showed each woman the footage of Kepner without audio. Both women confirmed the man in the video, Kepner, was the man in the car.

Police also obtained the grocery store's parking lot security camera footage from around the time of the March 30 incident. K.W.'s car and the man's car were parked outside the camera's view, but the camera did capture footage of the man's car as it left the parking lot. The vehicle's license plate appeared damaged. The plate "did not appear to be flat . . . . It appeared to either [be] wrinkled or waved or some sort of damage to it." The vehicle also appeared to have body damage on the driver's side front bumper cover. And the vehicle had a "distinct stance": "the rear of the car sat lower than the front of the car." Kepner's silver Toyota had the same damage to its license plate and front bumper, and it had the same "distinct stance" as the vehicle in the security footage.

Based on the March 30 and April 5 incidents, Kepner was charged by trial information with two counts of indecent exposure, a serious misdemeanor, in

violation of Iowa Code section 709.9(1) (2022). Kepner pled not guilty. A two-day jury trial began on August 29, 2023.[1]

Kepner intended to call Dr. Kimberly MacLin to provide expert testimony on eyewitness identification. The State filed a motion to suppress Dr. MacLin's testimony. The district court ruled the proposed testimony was inadmissible, finding the testimony of the two eyewitnesses could "be assessed by an objective and reasonable juror of average intelligence" and "[a]n expert is unlikely to resolve technical questions as none appear to exist." Kepner moved the court to reconsider. The district court determined Kepner could make an offer of proof on the expert testimony at trial, which was made on the record and outside the presence of the jury on the morning of the second day of trial. The district court confirmed its earlier ruling that Dr. MacLin's testimony was inadmissible.

The jury convicted Kepner on both counts. Kepner appeals.

## II.     Standard of Review

Whether to admit expert testimony on eyewitness identification is a matter within the sound discretion of a district court. *State v. Schutz*, 579 N.W.2d 317, 320 (Iowa 1998). We will disturb a district court's admissibility determination on such testimony only if the district court abused its discretion. *Id.* "An abuse of discretion occurs when the trial court exercises its discretion on grounds clearly untenable or to an extent clearly unreasonable." *Kurth v. Iowa Dep't of Transp.*, 628 N.W.2d 1, 5 (Iowa 2001) (internal quotation marks omitted) (quoting *State v.*

---

[1] In December 2022, a two-day jury trial resulted in a judgment of guilty on both counts. But due to the discovery of new, exculpatory evidence after entry of judgment, the district court granted Kepner's motion for new trial.

*Greene*, 592 N.W.2d 24, 27 (Iowa 1999)).  "'[W]e grant the district court wide latitude regarding admissibility' and will reverse only where the losing party was prejudiced by an unreasonable decision."  *Id.* (quoting *State v. Sallis*, 574 N.W.2d 15, 16 (Iowa 1998)).

**III.    Analysis**

Kepner claims the district court erred by excluding Dr. MacLin's expert testimony when it determined Dr. MacLin's testimony posed a risk of confusing the jury and "indirectly talk[ed] about the credibility of witnesses, which is just not allowed."

"In our system of justice, it is the jury's function to determine the credibility of a witness."  *State v. Dudley*, 856 N.W.2d 668, 677 (Iowa 2014).  Iowa law therefore prohibits expert witness testimony that comments on another witness's credibility either directly or indirectly.  *Id.* at 676–77.  Our supreme court has explained, "a witness's credibility 'is not a fact in issue subject to expert opinion.'" *Id.* at 676 (internal quotation marks omitted) (quoting *State v. Hulbert*, 481 N.W.2d 329, 332 (Iowa 1992)).  Such testimony poses the danger of appearing to establish a "scientific certainty stamp of approval on the testimony even though an expert cannot accurately opine when a witness is telling the truth."  *Id.* at 677.  A court commits an abuse of discretion by allowing expert testimony that comments on the credibility of another witness, whether that commentary be direct or indirect.  *Id.*

These principles still apply when the jury must weigh the credibility of an eyewitness.  "The jury may be an imperfect vehicle for assessing eyewitness evidence, but it is the vehicle for resolving guilt or innocence found in the Constitution."  *See State v. Doolin*, 942 N.W.2d 500, 515 (Iowa 2020) (quoting

Lawrence Rosenthal, *Eyewitness Identification and the Problematics of Blackstonian Reform of the Criminal Law*, 110 J. Crim. L. & Criminology 181, 243 (2020)).

Expert testimony has value when "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Iowa R. Evid. 5.702. For instance, an expert's factual descriptions may provide "insight into [a witness's] memory and knowledge of the facts." *Dudley*, 856 N.W.2d at 678. Expert testimony may be admitted on "psychological factors that can influence witness perception and memory," such as "the effect of stress, race, and the passage of time." *State v. Nguyen*, No. 99-1444, 2002 WL 575746, at *2 (Iowa Ct. App. Mar. 13, 2002). Such information can be a tool that helps the jury assess witness credibility. *See Dudley*, 856 N.W.2d at 678. But "there is a very thin line between testimony that assists the jury in reaching its verdict and testimony that conveys to the jury that [a witness's] . . . testimony [is] credible." *Id.* at 677.

During trial, the jury heard evidence about the photo identification process used by Detective Mayse and about Detective Mayse's use of the bodycam video with K.W. and E.P. to confirm Kepner's identity as the man in the car. The jury heard from K.W. and E.P. on their ability to identify Kepner during the photo array and about their confidence upon seeing Kepner in the bodycam footage. K.W. testified that after seeing the video footage, she recognized Kepner around town a few times, and during one passing, Kepner waved at her. E.P. testified that after learning Kepner's name, she looked him up on a social media website and saw a photo of him in "very similar . . . if not the same" sunglasses with orange lenses.

Later, a defense witness testified that while there was a social media photo of Kepner in orange-lensed sunglasses, it was from 2010, and Kepner no longer had those sunglasses.

With such testimony in mind, we turn to Dr. MacLin's offer of proof. Dr. MacLin discussed the danger of memory distortion that arises when an administrator confirms a witness's identification, even if that confirmation is subtle or inadvertent. She explained why certain practices are preferred to others and how use of the non-preferred practices undermines the reliability of the resulting identifications. Dr. MacLin stated:

> [A] lineup is a test of memory . . . . And the way that those photos are selected and then the way that those photos are administered to the witness all matter in terms of the type of identification you're going to get. And by "type," I mean one that feels trustworthy and reliable and one that may have some doubt to it, given how it was administered.

And while she also explained how subtle differences in positioning of the face or lighting in a photo can psychologically affect identifications, she continued:

> And the problematic issue is that it's not like the witness says, oh, there's a problem with this photo. A witness can be drawn to a particular photo, and that being drawn to that photo feels like recognition and so [the witness] may be inclined to make an identification because it feels like memory when, in fact, it has an issue to do with—that the photo itself or the suspect stands out.

Kepner asserts Dr. MacLin's testimony did not cross the line into impermissible credibility commentary and should have been admitted. Kepner compares the facts before us to two earlier decisions from this court, which considered the same legal question as here and reached different results. Kepner argues we should follow our decision in *State v. Palmer*, where we concluded a district court abused its discretion by excluding expert testimony on the results of

the expert's study. No. 04-1421, 2006 WL 468410, at *4 (Iowa Ct. App. Mar. 1, 2006). The study purported to measure the suggestiveness of the particular photo-identification technique the police used in that case. *Id.* at *2.

Kepner then distinguishes the circumstances here, and those in *Palmer*, from the circumstances in *Nguyen*. *See* 2002 WL 575746, at *2–3. In *Nguyen*, we affirmed the exclusion of an eyewitness-identification expert's testimony on "fact-specific hypotheticals" that presented "detail[ed] and case-specific[]" facts. *Id.* We determined, "[t]he likelihood the jury would associate the hypotheticals with live witness testimony was substantial." *Id.* at *3.

Kepner submits the difference between our holdings in *Palmer* and *Nguyen* stems from the type of testimony proposed: study results versus context-specific opinions. But our *Palmer* decision makes the reason for its outcome clear: "Our decision is significantly affected by the fact that . . . Palmer's conviction relied *exclusively* on uncorroborated eyewitness testimony." 2006 WL 468410, at *3 (emphasis added). This point is repeated multiple times throughout the *Palmer* decision. *Id.* at *3–4. In contrast, though not emphasized in our decision, the eyewitness testimony in *Nguyen* was corroborated by additional circumstantial evidence, including a vehicle that matched the description and license plate number given by eyewitnesses. *Nguyen*, 2002 WL 575746, at *2.

Unlike in *Palmer*, Kepner's conviction was not entirely dependent on uncorroborated eyewitness identification. Like in *Nguyen*, Kepner's vehicle matched the vehicle description provided by K.W. and E.P. The damage to and stance of Kepner's vehicle also matched the vehicle in the security camera footage from the grocery store parking lot. And, although Kepner's license plate number

was not an exact match to that reported by either E.P. or the gym owner, the differences are reasonably explained by the circumstances.

Kepner also argues that "reliability" is not equivalent to "credibility," and testimony explaining factors affecting reliability is admissible. But the State correctly notes, expert testimony can still cross the line into impermissible credibility commentary even if an expert's testimony focuses on generalities, as Kepner claims the "reliability" testimony did here. *See, e.g.*, *State v. Tjernagel*, No. 15-1519, 2017 WL 108291, at *4 (Iowa Ct. App. Jan. 11, 2017).

After the offer of proof, the district court heard arguments from both parties on the testimony's admissibility generally. The district court then asked both parties to speak to the admissibility of Dr. MacLin's testimony "specifically about photo lineup[s], their issues, problems, and why that should be allowed or should not be allowed."

After the parties presented their cases, the district court stated:

> I've heard the testimony of Dr. MacLin. I've heard arguments by both counsel. I've looked at both your motions and the research. The concern is that the testimony I heard today is—whether maybe not directly talking about the credibility of witnesses, it certainly is indirectly talking about the credibility of witnesses, and that's just not allowed from expert testimony.
> I heard over and over from Dr. MacLin, she talked about the jury, she talked about confidence doesn't equal accuracy. Those are the purview of the jury. They're not in the purview of expert testimony, and she can't be talking about those things.
> I don't know how I separate her testimony into just general practices of the photo array, which is what I was considering hearing . . . but then she would put in something about memory and about credibility of witnesses.
> And so given the offer of proof today, . . . I think it would confuse the jury. And I think it indirectly talks about the credibility of witnesses, which is just not allowed. And so her testimony is not going to be allowed today, and that will be my order.

. . . . Every comment she made about memory ended in a conversation about credibility of witnesses, accuracy. Those things are for the jury, not for the expert.

Upon our review of the record, including the transcripts from the trial and offer of proof, we cannot say the district court relied on untenable grounds or exercised unreasonable use of discretion. Even if the circumstances here present a case where the "fine line" between admissible and inadmissible expert testimony is blurred, the district court demonstrated careful consideration before finding that Dr. MacLin's testimony indirectly and impermissibly commented on witness credibility. Accordingly, we find no abuse its discretion in the district court's decision to exclude Dr. MacLin's testimony.[2]

## IV.    Conclusion

For the reasons stated above, we affirm.

**AFFIRMED.**

---

[2] Absent an abuse of discretion, we need not reach Kepner's prejudice argument.